UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

---

TERITA BUCHANAN-MOORE,
as Special Administrator of the Estate
of Frank Moore, II, and individually;
DEVONTE BUCHANAN, a minor,
appearing by Terita Buchanan-Moore,
parent and guardian;
OMAR BUCHANAN, a minor,
appearing by Terita Buchanan-Moore,
parent and guardian;
ERIC MOORE, a minor,
appearing by Terita Buchanan-Moore,
parent and guardian;

           Plaintiffs,

    v.                                                   Case No. 07-C-0730

CITY OF MILWAUKEE,
COUNTY OF MILWAUKEE,
TERRENCE BENDER,
JOHN AND JANE DOES 1-10,

           Defendants.

---

DECISION AND ORDER GRANTING DEFENDANTS' MOTION
FOR JUDGMENT ON THE PLEADINGS (DOC. #16)

Frank Moore II, an innocent neighbor probably checking on noises at the house next door, was shot to death in front of his son. Moore was killed less than five feet from his home on Milwaukee's north side when Sidney Gray, who had broken into the neighboring house, opened the side door and fired a shot piercing Moore's head above the right eye. Two other of Moore's children were nearby.

1

These tragic claims are set forth in a complaint filed by Moore's wife, Terita Buchanan-Moore, on behalf of herself, their children, and Moore's estate, against the City of Milwaukee, Milwaukee Police Detective Terrence Bender, and the County of Milwaukee. According to the complaint, City of Milwaukee police officers arrested Gray several times but charges were not processed because paperwork was not delivered properly, and earlier Milwaukee County had Gray in its custody for mental health reasons, but released him into the community.

Plaintiffs sue pursuant to 42 U.S.C. § 1983, asserting violations of Moore's right and their right to substantive due process. Defendants move for judgment on the pleadings under Fed. R. Civ. P. 12(c).

Rule 12(c) permits a party to move for judgment after the complaint and answer have been filed. *N. Ind. Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 452 (7th Cir. 1998); *see* Fed. R. Civ. P. 12(c). All facts alleged in the complaint are taken as true, with all reasonable inferences drawn in plaintiff's favor. *Pisciotta v. Old Nat'l Bancorp*, 499 F.3d 629, 633 (7th Cir. 2007). However, assertions in the complaint which undermine a claim are not ignored. *N. Ind. Gun & Outdoor Shows, Inc.*, 163 F.3d at 452.

The standard used to review a motion to dismiss under Fed. R. Civ. P. 12(b)(6) is applied. *Id.* The complaint must contain a short and plain statement of the claim showing that the pleader is entitled to relief. Fed. R. Civ. P. 8(a)(2); *Pisciotta*, 499 F.3d at 633. Moreover, the factual allegations must be enough to rise above the speculative level, *id.*, meaning that the contentions have to state a claim that is plausible on its face, *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007); *St. John's United*

2

*Church of Christ v. City of Chicago*, 502 F.3d 616, 625 (7th Cir. 2007), *cert. denied*, 128 S. Ct. 2431 (2008). The essence of a Rule 12(b)(6) motion is that assuming all of her facts are accurate, plaintiff has no legal claim. *Payton v. Rush-Presbyterian-St. Luke's Med. Ctr.*, 184 F.3d 623, 627 (7th Cir. 1999).

ALLEGATIONS IN THE COMPLAINT

The complaint maintains that when the City of Milwaukee, through its police officers, has arrested and detained a person for a crime committed within the City limits, the detainee is taken by City police to the jail run by Milwaukee County to await processing. (Compl. ¶ 17.) The County processes criminal complaints signed by the County's District Attorney or an Assistant District Attorney, and a City police officer, as complainant. (*Id.* ¶ 18.) By policy, the City police officer is given the signed written criminal complaint by an Assistant DA to take to a numbering clerk in the DA's office. The County clerk in the DA's office then processes the criminal complaint and files it with the clerk in state court. (*Id.* ¶ 19.) Large numbers of assaultive criminal detainees, who are inclined to violent attacks, are processed through these procedures. (*Id.* ¶¶ 20, 22.)

Additionally, the City and County interact regarding the detention and civil commitment of persons when City police officers detain a person they believe poses a threat to others because of mental health issues. (*Id.* ¶ 24.) City police officers complete a report indicating why they believe the mental health detainee is a threat to others and then deliver the mental health detainee to the County's mental health complex. (*Id.* ¶ 25.) If County mental health complex personnel believe the mental health detainee remains a threat to others after a seventy-two-hour evaluation, the County files a civil commitment

3

action through its corporation counsel. (*Id.* ¶ 26.) City and County witnesses (police officers and mental health complex personnel) may testify in a state court civil commitment hearing. (*Id.* ¶ 27.)

Sidney Gray was arrested by City police officers at least thirty-five times on seventy-seven charges between July 1996 and July 2006. (*Id.* ¶ 35.) Many of the charges included assaultive and violent attacks, and one was for criminal trespass to a dwelling. (*Id.* ¶¶ 35, 48.) Gray was committed to the County mental health complex numerous times and had been taken to the complex by City police officers several times. (*Id.* ¶¶ 36, 37.) County mental health complex doctors placed Gray on prescription medications that, if taken regularly, halted Gray's assaultive behavior. (*Id.* ¶¶ 39, 40.) After Gray's numerous stays at the County mental health complex it became apparent to complex personnel that, when unsupervised, Gray would not take his medications. (*Id.* ¶ 42.) As a result, mental health complex personnel contacted Gray's family members regularly upon Gray's release from the complex. (*Id.* ¶ 43.) County mental health complex personnel knew Gray lived with his family on Milwaukee's north side. (*Id.* ¶ 45.)

In 1999 and 2000, Gray was arrested and could not pay bail of $500 and $1000. (*Id.* ¶¶ 49-51.) From May 2000 to June 2006, Gray was not employed or collecting government benefits other than food stamps. (*Id.* ¶ 54.)

On June 13, 2006, the City police department detained Gray as a mental health detainee. (*Id.* ¶ 56.) The City police officer's report indicated that Gray was swinging a deadly weapon at others and chasing them down. (*Id.* ¶ 58.) City police officers delivered Gray to the County mental health complex. (*Id.* ¶ 60.) After seventy-two

4

hours, County corporation counsel began legal proceedings in state court to have Gray committed civilly. (*Id.* ¶ 61.) At the civil commitment hearing, testimony indicated that Gray posed an immediate threat to others. (*Id.* ¶ 62.) The state court judge agreed, committing Gray. (*Id.* ¶ 65.)

Less than a week later, on June 20, 2006, the County mental health complex released Gray, with his necessary medications, but without contacting Gray's family. (*Id.* ¶ 66.) Gray was released on Milwaukee's west side, with no means of transportation. (*Id.* ¶ 67.)

One day after his release from the County mental health complex, on June 21, 2006, Gray was arrested by City police officers for invading an occupied home. (*Id.* ¶ 68.) The police officers delivered Gray to the County jail. (*Id.*) While Gray was in custody at the County jail, he was not given his prescribed medications, notwithstanding the County's knowledge that if Gray was unmedicated his assaultive behavior would continue. (*Id.* ¶¶ 69, 70.)

While Gray remained in custody at the jail, on June 24, 2006, City Police Officer Terrence Bender signed a criminal trespass complaint, drafted by the County District Attorney's Office. (*Id.* ¶ 71.) The City police department had the ministerial task of physically taking the file to be numbered and then filed by a County employee with the state court. (*Id.* ¶ 72.) The City police department failed in this ministerial act and the criminal complaint disappeared. (*Id.* ¶ 73.) Because the criminal complaint was not numbered and filed, Gray was released by Milwaukee County on July 9, 2006. (*Id.* ¶ 74.)

5

Eight days following his release, on July 17, 2006, Gray was arrested by City police officers for invading another occupied home. (*Id.* ¶ 76.) Gray was returned to the County jail, where he remained until July 21, 2006. (*Id.* ¶¶ 77, 79-81.) During that custody Gray was not provided his medication, notwithstanding the City's and County's knowledge that without medication Gray became assaultive. (*Id.* ¶¶ 80, 81.)

Charges were not filed against Gray. (*Id.* ¶ 77.) Possible reasons for the failure to file charges include that the City police department failed to obtain a statement from a witness that would have allowed the District Attorney's Office to draft a criminal complaint, or that the District Attorney's Office failed to issue the criminal complaint after an Assistant District Attorney decided one was warranted. (*Id.* ¶ 78.) Further, from July 17 through July 21, 2006, the City police department and County District Attorney's Office knew Gray should have been in custody relating to the June 21, 2006, arrest. (*Id.* ¶ 81.) Gray was released on July 21 or 22, 2006. (*See id.* ¶ 81, 82.)

On July 22, 2006, Frank Moore was living on Milwaukee's north side. (*Id.* ¶ 29.) Gray broke into the home next door to Moore's by kicking in the front door. (*Id.* ¶ 30.) Moore walked up the lot line, in the few feet separating the homes. (*Id.* ¶ 31.) Gray, inside the neighboring house, opened the side door and shot Moore in the head, killing him. (*Id.* ¶ 32.)

The missing criminal complaint from June 24, 2006, reappeared in August 2006. (*Id.* ¶ 83.)

The complaint in this action charges that the City and County were incompetent while processing Gray regarding his June 21 and July 17, 2006 arrests. (*Id.*

6

¶¶ 84-87.) Also, they charge that the City and County ratified the ministerial errors of their employees "by tolerating a system in which administrative and ministerial errors are made routinely and often documented but, [sic] not corrected." (*Id.* ¶ 88.) Further, the complaint charges Bender with failing in his duty to personally deliver criminal complaints on which he is the complainant to a numbering clerk in the DA's Office. (*Id.* ¶¶ 115, 120.)

Additionally, the complaint asserts that Bender, the City, the County, as well as their John and Jane Doe employees violated Moore's substantive due process rights by placing Moore in a position of danger that he would not have faced otherwise. (*Id.* ¶¶ 92, 97, 104, 109, 116, 125.) Lastly, the complaint presents state-law claims of negligence and wrongful death against all defendants. (*Id.* ¶¶ 130-140.)

## JOHN AND JANE DOE DEFENDANTS

The John and Jane Doe defendants mentioned in the complaint have never been identified. Because no individuals have ever been named to replace the anonymous designations, the claims against the John and Jane Does will be dismissed.

## § 1983 CLAIM

To state a claim under 42 U.S.C. § 1983, plaintiffs must show that: (1) the defendant(s) deprived them of a right secured by the Constitution or federal law; and (2) the defendant(s) acted under color of state law. *Windle v. City of Marion, Ind.*, 321 F.3d 658, 661 (7th Cir. 2003). The defendants challenge whether plaintiffs can establish a violation of the Constitution or federal law.

The due process clause of the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law."

7

Case 2:07-cv-00730-CNC   Filed 09/15/08   Page 7 of 18   Document 36

U.S. Const. Amend. XIV, § 1. A person holds a liberty interest in his or her own physical safety. *See Stevens v. Umsted*, 131 F.3d 697, 701 (7th Cir. 1997).

However, the Due Process Clause is a safeguard against the actions of states and local governmental entities only. *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989).

> [N]othing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors. The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security. It forbids the State itself to deprive individuals of life, liberty, or property without "due process of law," but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means.

*Id.* In other words, the purpose of the Due Process Clause is "to protect the people from the State, not to ensure that the State protect[s] them from each other." *Id.* Thus, a state's failure to protect an individual from private injury does not violate that individual's substantive due process rights. *Waubanascum v. Shawano County*, 416 F.3d 658, 665 (7th Cir. 2005).

Based on language from *DeShaney*, the Seventh Circuit has recognized two exceptions to *DeShaney*'s general rule: (1) where the state has established a "special relationship" with an individual—for example if the victim is an incarcerated prisoner or involuntarily committed mental patient or, in certain cases, a foster child, *id.*; *Stevens*, 131 F.3d at 701-02; and (2) when the state "'affirmatively places a particular individual in a position of danger the individual would not otherwise have faced,'" *Waubanascum*, 416 F.3d at 665 (quoting *Monfils v. Taylor*, 165 F.3d 511, 516 (7th Cir. 1998)), i.e., when the

8

state itself created the danger, *King v. E. St. Louis Sch. Dist. 189*, 496 F.3d 812, 817 (7th Cir. 2007).

The plaintiffs rely upon the second exception, a state-created danger. In *King*, the Seventh Circuit identified three elements of a claim under the state-created danger doctrine: (1) the state, by its affirmative acts, must create or increase a danger faced by an individual; (2) the state's failure to protect an individual from such a danger must be the proximate cause of the injury to the individual; and (3) the state's failure to protect the individual must shock the conscience. 496 F.3d at 817-18. Here, only the second and third element need be discussed. As neither element is met, the court need not delve into the first element.

*King* did not alter existing Seventh Circuit law on state-created danger, as plaintiffs argue. Instead, it summarized existing case law. The court stated that a "fair reading of the decisions of this circuit and those of our sister circuits governing the state-created danger doctrine reveal[s] the following three principles that must govern our analysis," 496 F.3d at 817, and then set forth its three elements, *id.* at 818. The court looked at the tests of other circuits, including that of the Third Circuit, and indicated that the various tests reflected efforts to guide the fact-bound inquiry rather than fundamental doctrinal differences. *Id.* at 817-18 n.3.

A. Proximate Cause

More than a simple "but for" is required for a successful state-created danger claim. *Sandage v. Bd. of Comm'rs of Vanderburgh County, Ind.*, No. 3:07-CV-0049-SEB-WGH, 2008 WL 345977, *5 (S.D. Ind. Feb. 6, 2008) (Barker, J.). Even before it decided

9

*DeShaney*, the Supreme Court recognized the importance of proximate cause for substantive due process claims similar to the present one. In *Martinez v. California*, 444 U.S. 277 (1980), the plaintiffs' decedent had been tortured and murdered by a parolee five months after he was released from prison, despite his history as a sex offender. The plaintiffs claimed that the state officials responsible for the parole-release decision were liable under § 1983. *Id.* at 279. The Court found that

> at least under the particular circumstances of this parole decision, appellants' decedent's death is too remote a consequence of the parole officers' action to hold them responsible under the federal civil rights law. Although a § 1983 claim has been described as "a species of tort liability," it is perfectly clear that not every injury in which a state official has played some part is actionable under that statute.

*Id.* at 285. The circumstances of *Martinez* included the length of time that had passed between the release and the murder (five months) and the facts that the parolee was not an agent of the parole board and the parole board was not aware of any specific danger to the decedent as opposed to the public at large. *Id.*

In *King*, the Seventh Circuit explored in depth only the third element of the state-created danger theory. *Id.* at 818. However, the Seventh Circuit cited to and quoted a Third Circuit case as support for the proximate cause element. *Id.* In that case, *Kneipp v. Tedder*, 95 F.3d 1199, 1209 n.22 (3d Cir. 1996), the Third Circuit stated that "the state-created danger theory contemplates some contact such that the plaintiff was a foreseeable victim of a defendant's acts in a tort sense."

The Third Circuit's pattern jury instruction for a state-created danger claim explains that the harm to a plaintiff be "a foreseeable and fairly direct result" of the

10

defendant's conduct and that some type of relationship must exist between the plaintiff and defendant to distinguish plaintiff from the public at large. 3d Cir. Model Jury Instructions Civil 4.14 (2007). "Directness concerns whether it is possible to draw a direct enough connection" between the defendant's conduct and the harm at issue. *Id.* The jury is instructed to look at the chain of events that led to the harm and consider where the defendant's conduct fits within that chain. *Id.* Further, it is not enough to show that a defendant's conduct created a risk to the general public. The plaintiff must show that the defendant's conduct "created a foreseeable risk to" the plaintiff or a definable group of people including the plaintiff. *Id.* The focus in this portion of the Third Circuit test is whether the plaintiff was a foreseeable victim. *Id.* cmt. n.17.[1]

The Seventh Circuit has found that the definable group of people who are potential victims need not be narrow. The occupants of automobiles on Illinois Route 130 within a few hours of a police stop were found to be foreseeable victims in *Reed v. Gardner*, 986 F.2d 1122 (7th Cir. 1993). The police had arrested a possibly sober driver, and, knowing her passenger was intoxicated, left him in the car with the keys; the intoxicated passenger then drove the car and killed two people. According to the court,

> [w]hen the police create a specific danger, they need not know who in particular will be hurt. Some dangers are so evident, while their victims are so random, that state actors can be held accountable by any injured party. Despite the two hour time lapse and the distance between the place of Irby's arrest and the car accident, the events are not sufficiently attenuated to relieve the defendants of section 1983 liability.

---

[1] This discussion of a relationship between state and victim should not be confused with the special relationship exception under *DeShaney* for claims by prisoners or mental illness patients that they should have been protected from danger by the state. As noted by the Third Circuit, the use of the word "relationship" here is meant to focus is on whether the "plaintiff was a foreseeable victim." *See Kneipp*, 95 F.3d at 1209 n.22.

11

*Id.* at 1127. Nevertheless, the court noted that the "dangers presented by drunk drivers are familiar and specific; in addition, the immediate threat of harm has a limited range and duration." *Id.*

On the other hand, dangers to the public at large are insufficient for constitutional purposes. The Supreme Court's decision in *Martinez* rested in large part on the fact that "the parole board was not aware that appellants' decedent, as distinguished from the public at large, faced any special danger." 444 U.S. at 285. *See also Bowers v. DeVito*, 686 F.2d 616, 618 (7th Cir. 1982) ("[T]here is again no indication that the defendants knew that the plaintiff's decedent was in any special danger. . . . [T]he defendants . . . simply failed adequately to protect her, as a member of the public, from a dangerous man."); *Hodgson v. Miss. Dep't of Corr.*, 963 F. Supp. 776, 794 (E.D. Wis. 1997) (Curran, J.) ("There is no allegation that the Defendants were aware that Monique Hodgson, as distinguished from the public at large, faced any special danger. Therefore, this [state-created danger] exception does not apply.").

Magistrate Judge William E. Callahan dismissed a case similar to the present one based on lack of proximate cause. *Estate of Brown v. Barian*, 43 F. Supp. 2d 1008 (E.D. Wis. 1999). As *Estate of Brown* preceded *King*, Magistrate Judge Callahan used a four-part test for state-created danger, derived from Third Circuit law. *Id.* at 1014 (citing *Hodgson*, 963 F. Supp. at 794, in turn citing *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1152 (3d Cir. 1995)). The *Estate of Brown* case involved the death of Randy Brown, who was acting as a peacemaker in a street confrontation between Patrick Rucker and others when Rucker shot and killed him. 43 F. Supp. 2d at 1010. Rucker was on house arrest

12

at the time he killed Brown, had violated the house arrest sentence 158 times and had his electronic monitoring telephone disconnected without being taken into custody by state officials. *Id.* at 1010-11. Magistrate Judge Callahan found that Brown was totally unknown to the state actor defendants and was a random victim of Rucker's violence. Magistrate Judge Callahan distinguished *Estate of Brown* from *Reed* based on the "'familiar and specific'" risks posed by drunk drivers and their danger, which is immediate but of limited range and duration, creating a more definable group than the general public. *Id.* at 1019.

> Randy Brown was no more vulnerable to Rucker's unforeseen, random acts of violence than any other member of the public. In other words, unlike the Reeds or other motorists on Route 130 who were (literally) foreseeably in the path of Larry Rice's travel, Randy Brown's running into Rucker on August 21, 1997, was totally unforeseen and unpredictable.

*Id.* Further, Judge Callahan noted the unexpected acquisition of a weapon by Rucker, unlike the known keys needed to operate the motor vehicle in *Reed*:

> [I]n *Reed* the defendants knew that they were leaving the automobile keys with a man who was intoxicated. There is no allegation that here the defendants knew Rucker even owned a pistol, much less that he would be carrying one on August 21, 1997. . . .
> . . . . [I]n *Reed*, the harm that was ultimately caused was foreseeably and fairly direct . . . .

*Id.*

Thus, proximate cause in each case is a fact-specific inquiry, involving a consideration of time, geography, range of potential victims, and the nature of the harm that occurred.

Plaintiffs argue that in *King* the Seventh Circuit omitted the relationship or foreseeable victim requirement (as opposed to the victim being a member of the general

13

public) that appeared in cases such as *Hodgson*, *Estate of Brown*, and in the Third Circuit. (*See* Pls.' Mem. in Opp'n at 12.) But, as mentioned above, *King* did not alter existing law on this point. The Seventh Circuit said *King* was not a doctrinal change, and cited to the Third Circuit. The Seventh Circuit merely incorporated the foreseeable victim relationship concept in its second element—that of proximate cause.

Here, as a matter of law, taking all of plaintiffs' allegations as true, the defendants' actions cannot be considered a proximate cause of Moore's death. Moore's death was not a foreseeable or fairly direct result of the defendants' release(s) of Gray from custody for possible criminal behavior. An unpredictable chain of events led to Moore's death. Gray, medicated but without transportation, was released from the County mental health complex on June 20, 2006. He was picked up by police for invading an occupied home and the Assistant District Attorney planned to charge Gray, but due to ministerial paperwork errors Gray was released by the County jail on July 9, 2006. Afterward Gray was picked up by police for invading an occupied home but charges for some reason were never filed. Gray was released from the County jail on July 21 or 22, 2006. Thereafter, on July 22, he made his way to Milwaukee's north side, acquired a gun, broke into a home while carrying the gun, and shot Moore, an innocent neighbor.

As a matter of law, County mental health complex officials could not have anticipated when they released Gray on June 20, 2006, the following events: one month later he would be unmedicated and would acquire a gun; he would break into a house and have the gun on him; a neighbor would investigate the break in; and Gray would shoot the neighbor. The links of this chain of events are simply too weak regarding time, location, victim, and type of harm. Unlike *Reed*, there was no immediate danger when Gray left the

14

medical center, as he was medicated when released. Also, unlike *Reed*, there was no danger of limited duration. Gray, if a danger, was a danger indefinitely. Moreover, as in *Estate of Brown*, the acquisition and use of a gun was not foreseeable. Although Gray had been arrested for invasion of occupied homes and assaultive conduct, including swinging a weapon, plaintiffs do not allege facts suggesting that Gray had shot someone previously.

Further, and importantly, Moore was not within a small, defined group of potential victims of Gray's behavior. In an attempt to limit the geographic scope of Gray's potential victims, plaintiffs maintain that Gray was known by defendants to gravitate to Milwaukee's north side, and his family lived there. However, the court takes judicial notice that Milwaukee's north side is a large and heavily populated area. What is called the "north side" is a substantial part of the city and little different than the entire general public of some smaller cities.[2] Moore, one lone man among tens of thousands of people on Milwaukee's north side, who was killed because he lived next door to a house that Gray invaded, was not a foreseeable victim.

Although the time period shrinks regarding the second and third releases of Gray from custody, which occurred just a couple of weeks and one day or so before Moore's death, and Gray was unmedicated, creating a more immediate danger, the other foreseeability problems remain. The danger posed by Gray was of indefinite, undefinable duration. Gray's acquisition of a gun and its use on an innocent bystander who was a member of the general public were unpredictable rather than legally foreseeable.

---

[2] One real estate website describes Milwaukee's "north side" as including eight zip codes, with approximately 260,000 total residents. "Milwaukee North Side Demographics," www.homes.point2.com/neighborhood/us/wisconsin/milwaukee-county/milwaukee/north-side-demographics.aspx (last visited Aug. 28, 2008).

Plaintiffs liken the release of Gray into the general population of Milwaukee to the release of a mad dog in a shopping mall (Pls.' Mem. in Opp'n at 14), but the analogy is inappropriate. A state or municipality's release of a mad dog in a shopping mall may create a familiar and specific danger of an immediate nature and of limited range and duration such as the situation in *Reed*. But, for the reasons set forth above, the release of Gray cannot be considered a direct distinct danger to a limited population for just a limited time period such that the harm to Moore was foreseeable. The connection between Gray's three releases and the harm that befell Moore is too remote and the allegations in the complaint do not establish that the conduct of any defendant was the proximate cause of the plaintiffs' claimed injuries.

B.      Conduct the Shocks the Conscience

The Seventh Circuit has elaborated on what conduct "shocks the conscience." *King*, 496 F.3d at 818-19. The court has stated the fact-bound inquiry requires consideration of the circumstances and the official's actions. *Id.* When circumstances permit reasoned deliberation, conduct is "conscience shocking when it evinces a deliberate indifference to the rights of the individual." *Id.* at 819. But when circumstances require hurried judgments, "and thereby render reasoned deliberation impractical, conduct must reach a higher standard of culpability approaching malicious or intentional infliction of injury." *Id.* However, "in all cases, the conduct must be more culpable than mere negligence, which is 'categorically beneath the threshold of constitutional due process.'" *Id.*

16

The complaint before this court does not describe conscience-shocking conduct under the law or satisfy the plausibility standard of *Bell Atlantic* on this element. There are three instances of conduct at issue. First, on June 20, 2006, less than one week after the Milwaukee County Circuit Court civilly committed Gray, "the County (Milwaukee County Mental Health Complex) released Gray, with his necessary medications, but without contacting his family." (Compl. ¶ 66.) Gray was released with no means of transportation on Milwaukee's west side. (*Id.* ¶ 67.) Second, because City police officer Bender did not deliver a criminal complaint to the proper clerk for processing, Gray was released from the Milwaukee County jail on July 9, 2006. (*Id.* ¶¶ 72-74.) Third, no charges were filed against Gray for the July 17, 2006, burglary, due to County or City error, and no one realized that Gray should still have been in custody on the charges that Bender was supposed to deliver for processing. (*Id.* ¶¶ 76-82.)

While these allegations suggest errors on the part of City and County employees, they assert nothing more than negligence. As for the first incident, the complaint does not even allege that the County was without reason in releasing Gray, *with* his medication, or that contacting the family of an adult man (whose discharge was likely approved by doctors or other officials), was a legal requirement. Regarding the second incident, the complaint alleges no facts suggesting that Bender committed anything more than mere negligence. And as to the third incident, while the two municipalities and their various departments may not have been working efficiently or communicating sufficiently, the complaint fails to assert facts exhibiting deliberate indifference to the rights of any Milwaukee residents. Although the asserted facts suggest negligence, that is not enough.

17

## STATE LAW CLAIMS

Because the federal claims are being dismissed and this case is still at an early stage, the court declines supplemental jurisdiction over the remaining state law claims. See 28 U.S.C. § 1367(c)(3).

## CONCLUSION

For the foregoing reasons,

IT IS ORDERED that plaintiffs' claims against John and Jane Doe defendants are dismissed.

IT IS ORDERED that defendants' motion for judgment on the pleadings (Doc. #16) is granted and all federal claims against all remaining defendants are dismissed with prejudice.

IT IS ORDERED that plaintiffs' state law claims are dismissed without prejudice.

Dated at Milwaukee, Wisconsin, this 15th day of September, 2008.

BY THE COURT

/s/ C. N. Clevert, Jr.
C. N. CLEVERT, JR.
U. S. District Judge